IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN re ADMINISTAFF, INC. SECURITIES }
LITIGATION                          }
                                    }
_____ }  CIVIL ACTION NO. H-03-2082
This Document Relates to            }
                                    }
ALL ACTIONS                         }
                                    }
_____ }

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

Pending before the Court in this securities fraud case is Defendants' motion to dismiss (Doc. 25). After reviewing the pleadings, relevant documents, and the law the Court **ORDERS** that Defendants' motion is **GRANTED**.

**II. FACTS[1]**

A. The Individual Defendants

Defendant Paul J. Sarvadi ("Sarvadi") was the President and Chief Executive Officer of Administaff. Defendant Richard G. Rawson ("Rawson") was the Chief Financial Officer, Executive Vice President of Administration, Treasurer and a director of Administaff. Defendant Jay E. Mincks ("Mincks") was Executive Vice President of Sales and Marketing of Administaff. Defendant A. Steve Arzipe ("Arzipe") was Executive Vice President of Client Services of Administaff. Defendant Samuel G. Larson ("Larson") was Vice President of Enterprise Project Management of Administaff. Defendant John H. Spurgin, II ("Spurgin") was

---

[1] The court may properly consider materials filed with the Securities and Exchange Commission in a motion to dismiss proceeding. *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999). The court may "consider documents 'integral to and explicitly relied on in the complaint,' that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001). The Court may also take judicial notice of stock prices, and documents of public record. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000); *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Hausberg v. CompUSA*, No. 3:94-CV-1151-H, 1995 U.S. Dist.. Lexis 20333, at *31 n.14 (N.D. Tex. Oct. 30, 1995).

Vice President of Legal affairs, General Counsel and Secretary of Administaff. During the proposed class period, 28 March 2001 to 31 July 2002, each of the individual defendants sold shares in Administaff: Sarvadi sold 121,500 shares, Rawson sold 25,000 shares, Mincks sold 55,129 shares, Arzipe sold 28,400 shares, Larson sold 5,200 shares, and Spurgin sold 20,200 shares.

Defendant Administaff, Inc. ("Administaff" or "the Company") is in the business of providing small and mid-size businesses with services such as payroll and benefits administration, workers compensation programs, personnel management, and employee recruiting. Administaff charges its clients a flat rate per employee and generally enters into year long contracts. Providing healthcare is one of Administaff's largest expenses.[2] Administaff's principal offices are in Kingswood, Texas.

B. <u>AETNA and the Super Composite Rate.</u>

From 1989 to 2001, Aetna provided healthcare benefits to Administaff's customers' employees ("worksite employees"). Under their agreement, Administaff would fund all claims and premiums up to a monthly cap amount; Aetna, in turn, covered any charges above the monthly cap. The parties referred to the monthly cap amount as the "super composite rate." Before it could raise the super composite rate, Aetna was required to provide Administaff with two quarters notice. The notice provision allowed Administaff to accurately budget maximum healthcare costs for a six month period. This insured Administaff against a sudden spike in health care costs, but left it exposed, during the later half of its contracts, to a fast but stable increase in the price of healthcare.

---

[2]**Direct Costs**
The Company's primary direct costs associated with its revenue generating activities are (i) employment-related taxes ("payroll taxes"); (ii) **costs of employee benefit plans**; and (iii) workers' compensation insurance premiums....

Employee benefits costs are comprised primarily of health insurance costs (including dental and pharmacy costs), but also include costs of other employee benefits such as life insurance, vision care, disability insurance, education assistance, adoption assistance, a dependant care spending account and a worklife program....(Doc. 26, Exh. 1G, p. 23.) (emphasis added).

In September 2000 the price of healthcare skyrocketed. Aetna, on 28 March 2001, sent Administaff an accounting showing that, in a six month period, Administaff's plan had swung from a five hundred thousand dollar ($500,000) surplus to a twelve million dollar ($12,000,000) deficit. Aetna informed Administaff that, based on these numbers, it would have to raise the super composite rate or cancel the contract.

Against the backdrop of its negotiations with Aetna over the correct super composite rate, Administaff, on 2 May 2001, reported its first quarter earnings. Rawson, the Company's CFO, said that Administaff had "implemented operating expense controls" and anticipated that operating expenses would remain "relatively constant for the balance of the year."[3] Administaff's 10-K states that "operating expenses" do not include healthcare costs, which are considered direct costs. After the announcement Administaff's stock rose one dollar and thirty-six cents ($1.36).    Negotiations continued. On 28 May 2001 Aetna sent a letter to Administaff, calculating that healthcare costs per worksite employee per month in 2002 would be four hundred sixty-two dollars and fifty cents ($462.50) for the first quarter and four hundred seventy-nine dollars and thirty cents ($479.30) for the second.[4]

On 1 August 2001, Administaff announced its second quarter earnings, reporting a nineteen point three percent (19.3%) increase in the average gross profit per

---

[3] The press release stated, in relevant part,

"Our first quarter results were driven primarily by strong gross profit performance attributable to pricing strength and lower-than-expected unemployment taxes," said Richard G. Rawson, executive vice president of administration and chief financial officer. "We have also implemented operating expense controls as planned, and we anticipate that these costs will remain relatively constant for the balance of the year." Ex.2A

[4] On 4 October 2001, Aetna raised these estimates considerably, predicting health care expenses to reach five hundred forty-five dollars ($545) during Q1, 2002, and five hundred fifty-five dollars ($555) during Q2, 2002. Ex. 4D

worksite employee per month. [5] However, despite these positive numbers, more trouble with Aetna was around the corner.

In late September 2001 Aetna threatened to immediately terminate the contract if Administaff did not agree to a super composite rate of four hundred and sixty dollars ($460) per worksite employee, an almost forty dollar increase over previous rates. Were Aetna to follow through on its threat, Administaff would be in breach of all of its client contracts. Administaff agreed to the rate, under protest. In the meantime, it looked for other options. It found one in time for its next announcement of quarterly earnings.

On 5 November 2001 Administaff announced its third quarter earnings and the creation of its new health insurance carrier network.[6] Rawson began the earnings call by giving

---

[5] The release stated in relevant part as follows:

Administaff, Inc., the nation's leading Professional Employer Organization (PEO), today announced results for the second quarter and six months ended June 30, 2001. For the second quarter, the company reported net income and diluted earnings per share of $3.8 million and $0.13, versus $2.8 million and $0.10 in the 2000 period.

Revenues for the second quarter of 2001 increased 20.9% to $1.0 billion, due to an 11.4% increase in the average number of worksite employees paid per month, a 7.5% increase in fee payroll cost per worksite employee per month, and a 10.4% increase in gross markup per worksite employee per month. Gross profit increased 32.5% to $41.5 million. The average gross profit per worksite employee per month increased 19.3% to $204 in the second quarter of 2001, versus $171 in the 2000 period.

Our efforts to balance growth and profitability are continuing to produce the desired effects in spite of a sluggish economy," said Paul J. Sarvadi, president and chief executive officer. Ex. 2B

[6] The release stated in relevant part as follows:

Administaff, Inc., the nation's leading Professional Employer Organization, today announced results for the third quarter and nine months ended September 30, 2001. For the third quarter, the company reported net income and diluted earnings per share of $8.7 million and $0.30, versus $7.4 million and $0.25 in the 2000 period. "The fundamentals of our business model continue to produce positive results despite further softening in the economy," said Paul J. Sarvadi, president and chief executive officer. "With continued strong demand for our services, a 45% increase in trained sales consultants and the successful kickoff of our fall sales campaign, we are confident in our ability to successfully balance growth and profitability in 2002."

Revenues for the third quarter of 2001 increased 12.9% to $1.1 billion, due to a 7.8% increase in the average number of worksite employees paid per month, a 4.3% increase in fee payroll cost per worksite employee per month, and an 8.0% increase in gross markup per worksite employee per month. Gross profit increased 23.1% to $49.3 million. The average gross profit per worksite employee per month increased 14.3% to $232 in the third quarter of 2001, versus $203 in the 2000 period.

Administaff also announced today that the company has taken steps to expand and


a standard warning concerning forward-looking statements and directing listeners looking for more information to Administaff's filings with the SEC[7], which listed the relevant risk factors including increasing healthcare costs.[8] After Rawson discussed the third quarter numbers, Savardi, Administaff's CEO, discussed the strategy behind Administaff's health carrier announcement and the potential ramifications of the Aetna dispute. He detailed the series of events that led Administaff to terminate its relationship with Aetna, highlighting errors in the claims data reported to Administaff and Aetna's demand for an immediate premium hike. Savardi said,

> [G]iven the choice of leaving nearly 50,000 plan participants and their dependents without coverage, we're agreeing to pay these rates in spite of our disagreement with Aetna's right to pass through the increase, we reluctantly agreed and have paid these increased rates to this point.
>
> These new rates raised our premiums in the third quarter by the total $6 million we anticipated for both the third and fourth quarters and represents a potential additional $9 million in fourth quarter premiums.
>
> After the end of the third quarter, we received the preliminary results of the sample claims audit, which we believe brings into question the basis upon which we agreed to the initial increase in rates for the third and fourth quarters of this year.

---

enhance its healthcare coverage options for employees beginning January 1, 2002. Administaff will replace Aetna U.S. Healthcare with a best-of-class network of health insurance carriers led by UnitedHealthcare and including PacifiCare, Kaiser Permanente and Blue Cross Blue Shield of Georgia. (Doc. 22, ¶ 36; *See* Doc. 26, Administaff November 5, 2001 Press Release, Ex. 2C, p. 1.)

[7] He said:

"Before we begin I'd like to remind you that any statements that Paul or I make today that are not historical facts will be considered forward-looking statements within the meaning of the federal securities laws words such as expects, intends, plans, believes, estimates, likely, goal, assume, and similar expressions are used to identify forward-looking statements.
Forward-looking statements involve a number of risks and uncertainties that have been described in detail in the company's filings with the Securities and Exchange Commission. These risks and uncertainties may cause actual results to differ materially from those stated in such forward-looking statements." Ex. 3A

[8]

"Among the factors that could cause actual results to differ materially are: . . . (iii) changes in the Company's direct costs and operating expenses including increases in health insurance premiums . . ." Ex. 1E

> We have shared these results with Aetna and intend to work diligently with them to resolve the audit discrepancies in a professional and businesslike manner.
>
> Prevailing in this argument would generate a credit of up to $6 million. If we are unable to resolve either the claim payment accuracy issue and /or the contractual dispute during the fourth quarter, then we may incur a one-time of up to $9 million while we pursue our additional remedies.
> Ex.3A

When Savardi finished, Rawson took over and discussed his fourth quarter guidance. After expressly "excluding any effect related to the dispute with Aetna," he projected that gross profit per worksite employee in the fourth quarter of 2001 would increase 9% to 11% over the fourth quarter of 2000, yielding a per employee profit between two hundred forty-eight dollars and fifty-two cents ($248.52) and two hundred fifty three dollars and eight cents ($253.08). The day after the press release and earnings call, Administaff's stock price rose from twenty-one dollars and sixty-five cents ($21.65) to twenty-seven dollars and twenty-nine cents ($27.29).

The same day it announced third quarter earnings, Administaff initiated suit against Aetna. The lawsuit was tried in the Southern District of Texas in late October 2003. After the evidence was presented, the jury found that:

> (1) Aetna negligently provided financial reports concerning the Administaff plan;
>
> (2) Aetna's negligence caused Administaff to wrongfully pay increased rates of $6 million and $9.5 million;
>
> (3) Aetna breached its contract with Administaff by imposing rate increases without the two quarters' waiting period;
>
> (4) Aetna breached its contract with Administaff by imposing rate increases by threatening to terminate coverage in September 2001.

(See Doc. 26, "Verdict" in <u>Administaff, Inc. v. Aetna Life Insurance Co.</u>, C.A. No. H-01-3802 (S.D. Tex.) (Oct. 30, 2003), Ex. 4E, pp. 7, 14, 18, 20 & 22).

C. <u>The Insurance Carrier Network and Incurred But Not Reported Claims</u>

Effective 1 January 2002, Administaff shifted to a network of insurance carriers including United Healthcare, PacifiCare, Kaiser Permanente and Blue Cross Blue Shield of Georgia. Administaff changed the way it paid for healthcare and the way it accounted for it. Under the new system Administaff was liable for all healthcare costs incurred. For accounting purposes it expensed actual claims, administrative costs, and an estimate of incurred but not (yet) reported claims ("IBNR"). Calculating IBNR required Administaff to project how many claims would be made in a quarter but not reported until the next. This new accounting method was disclosed in Administaff's first quarter 2002 10-Q. See Ex. 1E pp. 10,15, 21.

On 22 January 2002, Administaff downwardly revised its fourth quarter forecast. The press release stated in part as follows:

> Administaff, Inc., the nation's leading Professional Employer Organization (PEO), today announced that it expects its results for the fourth quarter 2001 to fall short of its previous guidance on several key metrics.
>
> The company's unit growth of 5.5% was lower than its previous guidance due to continued weakness in the economy, which resulted in a higher level of layoffs within the existing client base and termination of clients with financial difficulties. Gross profit per worksite employee is expected to be approximately $215 per month. This is lower than previous guidance, primarily due to the disputed health insurance rate increase by Aetna and higher-than-expected payroll tax expense during the month of December. In addition, operating expenses for the fourth quarter are expected to be approximately $37.4 million, slightly higher than expected due to costs incurred in the transition to the company's new health insurance carrier network.
>
> \*         \*         \*         \*
>
> "While further weakening of the economy and a change of health insurance carriers posed significant challenges during the quarter, our sales force achieved 106% of our fall campaign goal," said Paul J. Sarvadi, president and chief executive officer. "These results reflect strong demand for our services and our success in training a large number of sales consultants during 2001. We believe these factors will provide a solid foundation for 2002.

(*Id*. at ¶ 39; Doc. 26).   A day after the press release Administaff's shares closed at twenty-two dollars and eighty cents ($22.80), down from twenty-five dollars and fifty-six cents ($25.56).

On 19 February 2002 Administaff announced fourth quarter earnings. The press release stated in part:

- 7 -

> "Our 2001 results demonstrate our ability to grow profitably through a difficult period," commented Paul J. Sarvadi, president and chief executive officer. "Throughout the year we continued to execute our long-term plan by growing our sales force, opening new markets and expanding our service capacity, while holding the line on operating expenses. As a result, we are poised for a strong year in 2002." Ex. 2E

During the earnings call, Rawson, after reciting the disclaimer about forward-looking statements quoted in n.7, discussed Administaff's 2001 numbers and forecast its 2002 prospects. Rawson said he expected gross profits per worksite employee per month to increase 5.5% to 6% over 2001 first quarter profits.

These numbers never materialized. On 1 May 2002 Administaff announced lower than expected earnings for the first quarter.[9] During the earnings call Rawson, after repeating the same disclaimer about forward-looking statements, explained that the "medical pricing mismatch" experienced during the first quarter would "have an adverse effect on gross profit in Q-2." See Earnings Call Transcript, Ex.3D. He then predicted that gross profit per worksite employee would be between one hundred eighty-eight dollars ($188) and one hundred ninety-six dollars

---

[9]The press release stated in relevant part:

> Administaff, Inc., the nation's leading Professional Employer Organization, today announced results for the first quarter ended March 31, 2002. The company reported a net loss and diluted net loss per share of $5.7 million and $0.20, versus a loss of $4.3 million and $0.16 in the 2001 period. Historically, the company's earnings pattern has included losses in the first quarter, followed by improved profitability in subsequent quarters throughout the year. This pattern is due to the effects of employment-related taxes that are based on each employee's cumulative earnings up to specified wage levels, causing employment-related taxes to be highest in the first quarter and then decline over the course of the year.
>
> Revenues for the first quarter of 2002 increased to $1.1 billion, or 10.2% over the 2001 period. This increase was due to an 8.9% increase in the average number of worksite employees paid per month and a 5.1% increase in gross markup per worksite employee per month, partially offset by a 0.5% decrease in fee payroll cost per worksite employee per month. Gross profit increased 9.9% to $30.6 million. The average gross profit per worksite employee per month increased 0.7% to $139 in the first quarter of 2002, versus $138 in the 2001 period.
>
> "Our business model has demonstrated significant resiliency over the last 18 months in the face of layoffs, decreases in average pay rates and the increase in business failure rates," said Paul J. Sarvadi, president and chief executive officer. "Our growth has begun to accelerate, as we have added 3,900 worksite employees since year-end without clear signs of an economic rebound without our client base. However, the same factors that have applied downward pressure on our business in slow economic periods will provide significant upside as a recovery takes hold." Ex.2F

($196) per month during the second quarter. Id. Rawson indicated that Administaff expected "continued price increases to eliminate the pricing mismatch by year-end." Id.

        On 1 August 2002 the Company announced second quarter earnings. The press release stated in relevant part:

> Gross profit decreased 12.0% to $36.6 million, due primarily to higher benefits costs. The average gross profit per worksite employee per month decreased 22.1% to $159 in the second quarter of 2002, versus $204 in the 2001 period. The company's benefits cost per worksite employee increased $89 per month as a result of a 28.1% increase in the cost per covered employee. This increase was partially offset by a 4.2%, or $36, increase in gross markup per worksite employee per month, and a decrease in the payroll tax cost per worksite employee of $8 per month due to a lower payroll average. Ex. 2G

Rawson explained during the earnings call that IBNR costs had been substantially higher than predicted impacting direct costs and lowering gross profit, and this, in turn, had effected first quarter earnings and forecasts. Additionally, second quarter profits were impaired by employee healthcare costs of four hundred and eighty-three dollars ($483) per worksite employee per month. After this news, Administaff's share price fell from seven dollars and fifty cents ($7.50) to four dollars and twenty cents ($4.20).

        On 13 June 2003 the first of seven similar securities fraud class actions was filed on behalf of Administaff's shareholders. On 30 March 2004, the Court consolidated these actions and appointed lead plaintiffs, lead counsel, and liaison counsel. Plaintiffs filed their consolidated complaint on 14 May 2004. Administaff filed its motion to dismiss on 14 June 2004, Plaintiffs filed their response on 16 July 2004, and Administaff replied on 13 August 2004. Defendants filed an additional brief in support of their motion to dismiss on 26 April 2005, Plaintiffs responded on 16 May 2005, and Defendants replied on 27 May 2005. The motion is now ripe.

**III. LAW**

        Federal Rule of Civil Procedure 9(b) requires that the securities fraud plaintiff plead the facts constituting the fraud with particularity. Plaintiffs must specify the allegedly fraudulent statement, identify the speaker, identify when and where the statement was made,

and explain why it is fraudulent. Williams v. WMX Technologies, Inc., 112 F.3d 175, 177-78 (5th Cir. 1997). The elements of a cause of action under § 10(b) of the Securities Exchange Act of 1934 and 17 C.F.R. § 249.10b-5 (2001) are "(1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." Southland Securities Corp. v. Inspire Ins. Solutions Inc., 365 F.3d 353, 362 (5th Cir. 2004) (citing Williams, 112 F.3d at 177). Material facts are those facts that would assume "actual significance in the deliberations of the reasonable shareholder." Id. (quoting Grigsby v. CMI Corp., 765 F.2d 1369, 1373 (9th Cir. 1985)). The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires plaintiffs to explain why the challenged statement or omission is false or misleading. Williams, 112 F.3d at 177 n.4. Additionally, the complaint "with respect to each act or omission alleged . . . [must] state with particularity facts giving rise to a strong inference," 15 U.S.C. § 78u-4(b)(2), that the defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Scienter also includes severe recklessness, which the Fifth Circuit defines as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Rosenzweig v. Azurix Corp., 332 F.3d 854, 866 (5th Cir. 2003) (quoting Nathenson v. Zonagen, Inc., 267 F.3d 400, 408 (5th Cir. 2001) (quoting Broad v. Rockwell, 642 F.2d 929, 961 (5th Cir. 1981))); Abrams v. Baker Hughes Inc., 292 F.3d 424 (5th Cir. 2002). To determine whether plaintiffs have met their burden of pleading facts giving rise to strong inference of scienter "the district court must engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak." Id. 332 F.3d at 867.

The Court of Appeals for the Fifth Circuit has rejected the group pleading doctrine as contrary to the PSLRA. Southland Ins., 365 F.3d at 365 ("the PSLRA requires the

plaintiff to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud."). Notwithstanding the particularity requirement, "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue." Id. As regards the corporation itself, the corporation is responsible for all statements made by its executives on its behalf, and is deemed to have acted with the same state of mind as the person making the statement. Id. (citing Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435 (9th Cir. 1995) ("there is no case law supporting an independent "collective scienter" theory.")).

The PSLRA's Safe Harbor provision protects forward looking statements. 15 U.S.C. § 78u-5(c)(1)(A). Title 15 United States Code Section 77z-2(i)(1) defines a forward looking statement as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures , dividends, capital structure or other financial items
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission . . .

For a forward-looking statement to qualify for Safe Harbor protection it must either be (1) "identified as a forward-looking statement, and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) "immaterial." 15 U.S.C. §§ 77z-2(c)(1)(A), 78u-5(c)(1)(A) (1996); 15 U.S.C. §§ 77z-2(c)(1)(B), 78u-5(c)(1)(B) (1996). Meaningful cautionary statements are "company specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors. Southland Ins., 365 F.3d at 372 (citing H.R. CONF. REP. NO. 369,

10th Cong., 1st Sess. 31, 44 (1995)).  Oral statements qualify for Safe Harbor protection provided: (1) the speaker cautions the listener that the oral statement is forward-looking and that actual results could differ materially; (2) the speaker informs the listener that additional information that could cause actual results to differ materially is contained in a readily available written document; (3) the speaker identifies the document or portion thereof containing the information; and (4) there is appropriate cautionary language in the identified document.  15 U.S.C. §§ 77z-2(c)(2), 78u-5(c)(2) (1996).  Documents filed with the S.E.C. are considered readily available. Id. at §§ 77z-2(c)(3), 78u-5(c)(3).

## IV. APPLICATION OF LAW TO THE FACTS

Plaintiffs allege that each Defendant is liable for making false statements or for failing to disclose adverse facts known to him about Administaff.  In their consolidated complaint Plaintiffs allege five material misrepresentations giving rise to liability.

### A. The 2 May 2001 Press Release

*"We have also implemented operating controls as planned, and we anticipate that these costs will remain relatively constant for the balance of the year."*

Plaintiffs allege that this statement is actionable as a misrepresentation because Rawson, on 2 May 2001, was already aware of a possible dispute with Aetna over healthcare costs. Defendants counter that Rawson's statement was not materially false or misleading because Administaff's 2000 10-K defines "operating expenses" as excluding healthcare costs.  After reviewing Administaff's 2000 10-K, the Court agrees that healthcare costs are included as direct costs rather than as operating expenses.  See Administaff 2000 10-K, Ex.1A 22-23.  Plaintiffs, seemingly conceding this fact, have not opposed Defendants' motion in this regard.

### B. The 5 November 2001 Projections

*"Excluding any effect related to the dispute with Aetna as Paul just discussed, we would expect gross profits per worksite employee to increase 9 to 11 percent over the fourth quarter of last year."*

Plaintiffs' allege that this statement, made by Rawson during the third quarter 2001 earnings call, is actionable because he knew that a 9 to 11% increase in profits was impossible. Defendants claim the statement was predictive and protected by the PSLRA's Safe Harbor. Looking at it in context, the statement falls within the Safe Harbor and, additionally, Plaintiffs have failed to explain why the statement was false.

Rawson's statement is protected by the PSLRA's Safe Harbor because it was identified as forward-looking and accompanied by cautionary language. Rawson began the conference call by discussing forward-looking statements, both he and Savardi went to great lengths to disclose Administaff dispute with Aetna and its possible ramifications, and Savardi even discussed the possibility of a one time charge or credit of up to nine million dollars, cautioning that the resolution of the dispute would be "material to the results of the company." This cautionary language combined with Rawson's discussion of forward-looking statements is enough to bring the statement within the Safe Harbor.

Plaintiffs allege there is no Safe Harbor protection because Rawson did not identify each particular statement as forward-looking and neither he not Savardi revealed that Administaff had filed suit against Aetna. Neither of these arguments is convincing. The Court rejects Plaintiffs' first contention to the extent it implies that, in order to qualify for Safe Harbor protection, a speaker must preface the particular sentence complained of with another identifying the following sentence as containing a forward-looking statement. To accept such a view would transform communications between companies and investors into a mere litany of disclaimers rather than a meaningful exchange of information. Given the nature of the statement itself, i.e. an earnings forecast, and Rawson's earlier disclosure that the earnings call would contain forward-looking statements, the forecast qualifies for Safe Harbor treatment. Plaintiffs' second argument – that the statement should be deprived of Safe Harbor protection because Savardi and Rawson did not say Administaff had filed suit against Aetna – misses the forest for the trees. Whether a cautionary statement is sufficient to alert investors to the risks involved in a forward looking statement depends on the statement as a whole. A corporation need not provide every detail of a

- 13 -

potential risk to qualify for Safe Harbor treatment; instead, it need only provide sufficient detail to make investors aware of the source, magnitude and certainty of the contemplated risk. The transcript of the earnings call reflects that the cautionary statements made therein adequately informed the investing public of the risks associated with Administaff's dispute with Aetna.

Plaintiffs have also failed to meet their pleading burden under the PSLRA. To make Rawson's 5 November 2001 statement actionable, Plaintiffs were required to first allege facts supporting the conclusion that Rawson's projections were impossible to achieve and then allege further facts supporting a strong inference that Rawson knew this to be the case or acted with reckless disregard to it. Plaintiffs argue that Administaff's agreement to a four hundred and sixty dollar super composite rate made a nine to eleven percent increase in gross profit per worksite employee impossible. This argument fails for two independent reasons. First, Rawson said his projections did not take into account any effect from the dispute with Aetna. Second, Plaintiffs have not alleged facts from which a jury could conclude that the increased super composite rate made the projections mathematically impossible. Many factors besides the price of healthcare contributed to Administaff's gross profit per worksite employee. Even the January 22nd correction Plaintiffs point to as evidence of fraud states that Administaff is revising its projections to increased healthcare costs, higher than expected payroll tax expenses, and slightly higher than expected operating expenses. Additionally, the super composite rate set the maximum amount of money Administaff *could* be forced to pay, not the amount it *would* be forced to pay. For Plaintiffs to prevail on their claim they must allege facts showing that Rawson's projections were unsupported. They have not.

C. <u>The 19 February 2002 Projections</u>

*"We expect gross profit per work site employee per month to increase 5.5-6% over Q1 of 2001, which is due primarily to lower unemployment tax rates that result from our corporate entity restructuring."*

Plaintiffs claim this statement, made by Rawson during Administaff's fourth quarter earnings call, was materially false and misleading because Aetna had forecast in May

- 14 -

2001 that Administaff would incur healthcare costs of four hundred sixty-two dollars and fifty cents ($462.50) per employee in the first quarter of 2002.  Plaintiffs evidence consists of Aetna's May 2001 letter and a September 2001 internal Administaff email.  Defendants argue that the statement is protected by the PSLRA's Safe Harbor and, in any event, that Administaff had no reason to rely on data given to it by Aetna, whom it was suing for providing inaccurate claims data.

Rawson's forecasts are protected by the PSLRA's Safe Harbor provision.  At the beginning of the earnings call Rawson specifically warned his listeners that any statements not of historical fact should be treated as forward-looking.  He then went on to direct listeners to the company's filings with the SEC for further information on risk factors that could cause results to materially differ from those predicted in the forward-looking statements.  A review of the documents Administaff filed with the S.E.C. reveals that they all contain language warning investors that increasing healthcare costs could effect the company's performance.  Rawson's predictive statements are therefore not actionable as fraud.

Additionally, the evidence presented by Plaintiffs does not satisfy the PSLRA's strong inference requirement.  At the time these projections were made, Administaff was in the midst of a lawsuit with Aetna and had every reason to doubt its projections.  This conclusion is not undercut by the internal email, which refers not to Aetna's 2002 projections, but instead to its 2001 projections. Finally, Rawson's trading activity in Administaff stock was small and in keeping with his past trading.

 D.  <u>The 1 May 2002 Press Release</u>

 *"The average gross profit per worksite employee per month increased 0.7% to 139$ in the first quarter of 2002, versus $138 in the 2001 period.*

Plaintiffs contend that this statement, made in Administaff's first quarter 2002 earnings press release, was false and misleading because it failed to account for two million four hundred thousand dollars ($2,400,000) in IBNR.  Plaintiffs argue this was a consequence of Defendants estimating healthcare costs at four hundred and forty-nine dollars ($449) per

covered employee per month. A number alleged to be unreasonable in light of Aetna's projections a year earlier. The Court finds that these claims do not overcome the burdens imposed by the PSLRA.

There is no doubt that Administaff underestimated IBNR for the first quarter of 2002. The question is whether Administaff did so with the intent of defrauding purchasers of Administaff's shares. Plaintiffs marshal two pieces of evidence in support of this proposition. First is a letter from Aetna to Administaff in May 2001 estimating that healthcare costs per covered employee per month would be four hundred sixty-two dollars and fifty cents during the first quarter of 2002. Second, is an Administaff internal email sent in September 2001, estimating that healthcare costs during the fourth quarter of 2001 would be four hundred fifty-four dollars and sixty cents. Plaintiffs claim that, in light of these two estimates, Administaff's decision to calculate IBNR using a per employee per month cost of four hundred and forty nine dollars was unreasonable and is clear evidence of fraud. The Court disagrees for the following reasons: first, Plaintiffs are complaining about a less than two percent change in calculated expenses over the course of a year that saw a dramatic change in the way Administaff provided healthcare to its covered employees; second, Aetna's numbers were discredited by the ongoing dispute between the two companies; and third, this was Administaff's first attempt at calculating IBNR under the new system. Absent other evidence more contemporaneous with the decision, the Court cannot conclude that the decision not to use these earlier calculations raises a strong inference of scienter.

E. The 1 May 2002 Earnings Call

*"[W]e expect gross profit per worksite employee to be $188 to $196 per worksite employee per month for the second quarter. We expect continued price increases to eliminate the pricing mismatch by year-end."*

Plaintiffs allege that this statement, made by Rawson during Administaff's second quarter earnings call, was false and misleading because it was based on an unreasonably low estimate of healthcare costs. Once again, Plaintiffs base their argument on Aetna's May

2001 projections and the September 2001 Administaff internal email. Defendants argue that the statement is protected by the Safe Harbor because it was identified as forward looking and accompanied by meaningful cautionary language. After examining the entire transcript of the earnings call, the Court agrees with Defendants for the reasons articulated in section IV. C *supra*. The statement is protected by the Safe Harbor, and, in any event, Plaintiffs have not pled facts raising a strong inference of scienter.

F. Group Pleading

Plaintiffs' complaint only makes specific allegations with regard to Defendant Rawson, and by implication about Administaff. Therefore, Plaintiffs claims against the remainder of the defendants are dismissed for failure to comply with the particularity requirements of the Federal Rules of Civil Procedure and the PSLRA.

V. CONCLUSION

For the aforementioned reasons the Court **ORDERS** that Defendants' motion to dismiss (Doc. 25) is **GRANTED**. Plaintiffs claims are **DISMISSED WITH PREJUDICE**.

**SIGNED** at Houston, Texas, this 30th day of March, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE